3-17-07-13 Maria Isabel Vizcarra v. LMR Home Health Care, Inc. and Margo and Lovita Ranchero, accounts by Michael Reyes. Mr. Reyes, you may proceed. May it please the Court, Counsel. Good afternoon, Your Honors. My name is Michael Reyes and I represent LMR Home Health Care, Inc., Eduardo Ranchero, and Lovita Ranchero. This matter comes to you by way of a civil case that was tried in the circuit court of Will County. What happened in this case, judges, involves a dispute regarding a small home health care agency by the name of LMR Home Health, an Illinois closely held corporation. Prior to May of 2003, Your Honors, Mrs. Ranchero, a nurse by trade, established a home health care agency as working with a consultant at that time. The consultant referred ultimately another consultant who happened to be the plaintiff's wife by the name of Mabel Vizcarra. At that point, Your Honor, what happened was that Ms. Vizcarra and Ms. Ranchero worked together towards creating a home health care agency. The evidence, we believe, showed that Mrs. Ranchero really didn't need, she was already a nurse, she already filed the application, she was looking for a business partner who would support her in her venture. At the time, Your Honor, the parties did not have lawyers. The plaintiff's husband created some crude corporate documents at the time and that's why the original filings of this company were a little bit sloppy and not to the extent that we would have liked a full-blown trial. Ultimately, Your Honor, there was a situation in which they formed the home health care agency, they filed the application. The testimony showed that Mrs. Vizcarra, the plaintiff in this case, her involvement was limited to providing approximately $11,500 as her capital contribution and she assisted in the application process that was with the IDPH. The application process for a home health care agency is very laborious. The testimony at trial indicated, Your Honor, that not only do you have to file the application, you also have to care for 10 patients at your own cost. Those 10 patients are patients that would be ultimately certified by CMS, Centers for Medicare and Medicaid Services, and what happens in those, you have to have approximately at least 6 to 10 nursing visits that are paid on the cost of the applicant and then you have to show that those costs, including any physical therapy costs. What does all this go to? What's the real issue here? You've got a minority shareholders' suit that wants evaluation. Yes, and ultimately what I'm saying is, Judge, when you take a look at what Mrs. Vizcarra really did in this case, Your Honor, it goes to show what I think the intent of the parties were and when we get to the point in 2004, Your Honor, when my client gave the money back to Mrs. Vizcarra and she did nothing else, she had an expectation that she was going to file her lawsuits at that time. So you're going after a statute of limitations issue? That's correct. Okay. So ultimately when we take a look, and I won't spend too much time on it, but this is a very laborious process, and during the entire trial, the evidence came out that the only thing that Mrs. Vizcarra, the plaintiff in this case, ever did was provide $11,500 in this. And the important part is... That's really not, that would be diminutive of that. A lot of people search the world for capital. But I think when you take a look at the capital that is required to open up a home health care, including the fact that you have to have $100,000, what they call money in the bank or show money, in order to show CMS that you're worthy to have a home health care agency, it goes to show what Mrs. Vizcarra really was doing ultimately in this case. And the fact of the matter is she provided so very little assistance, so when Mrs. Ranchero went to her on October 8th of 2004 and said, you're not doing your part, here's your money back, that was a key element in this case, and that's what we've been trying to say in this entire matter. The fact of the matter is, Your Honor, that Mrs. Vizcarra did nothing after that. They gave her a check. They said, you're not a shareholder anymore. Every single time she had asked for anything, she said, you're not. We said, my client said, you're not a shareholder. Didn't that letter make an offer to buy the shares? I think, you know, I understand the letter, Your Honor, but I think what happened was they actually gave her the check. Now, granted, I think the testimony was also that my client went to her office, and this letter was drafted by an attorney. My client is somewhat different than what my client testified to. My client said that I'm giving you back your money, you're not a shareholder anymore. So I think there's a little discrepancy in that. I think at some point my client said to her, you're not a shareholder, and gave the money back. It's like buying the shares. Now, she never gave those shares back, Your Honor. I understand that, and I guess that's why we're ultimately at trial. She did not cash the check. She also didn't return the check, Your Honor. But she didn't sign the – she didn't accept the offer, right? She didn't do anything. That's correct, Your Honor. That's correct. But at that point, my client said, you're not a shareholder. And our position to this Court on the first part of the appeal, Your Honor, is that they failed at that point to go ahead and assert any rights. The three counts that they filed in this case, Your Honors, are breach of fiduciary duty, breach of 12.56 of the Illinois Business Corporation Act, and ultimately a mandamus action under 7.05 of the Illinois Business Corporation Act. But ultimately, the key point is that you have to be a shareholder. And throughout this entire matter, judges, the fact is they never asserted that right whatsoever. They waited six years and nine months to go ahead and bring this cause of action at that point with no explanation. In fact, the trial judge even said, I don't know what you guys were doing. In 2008, you guys knew this and we don't even understand. You said you were going to file a lawsuit within 60 days and you didn't do that. And simply put, the fact is they did not file this lawsuit timely. And the key element under all of these actions and the condition preceding that we're talking about here is you really need to be a shareholder. And the point I'm trying to make to you is my client, in good faith, gave her this money back and said this is all you've provided us. The trial testimony and the judge even said this. After she gave you that money back, you did nothing. You didn't show it. They gave her more than, I mean, it wasn't the amount of money she contributed in capital. $11,500. We gave her $12,000. So you were given a profit of $500. Yes, Judge. And that just goes to show you that my client was trying to be fair. My client's never stolen any money from her, never done anything. My client worked very diligently. And quite frankly, I think the only reason she filed this lawsuit at some point in time was because my client worked very, very hard. The plaintiff in this case also owns the exact same business her own home health care agency. She was working on her business. My client was working on hers. And she had no involvement in this case from the equitable positions at all, Your Honor. The fact of the matter is my client did everything she can, and then we have this lawsuit that they've been fighting for many, many years. We've spoken to the client. We took no inconsistent position. The counsels have asserted a couple of different issues, and if I may, I'd like to address those as well. They addressed the continuing violation exception. The problem that we have with the continuing violation exception is that everything arises out of one act. And there's a case that I think is really important that illustrates this. The case of Ravensworth v. City of Chicago, 307-113-161, talks about a distinction between the continual effect and the continuing violation. In this case, Your Honors, everything arises out of what occurred on October 8th of 2004. When she gave that check back, when she said you are no longer a shareholder, showed up in her office and said that, at that point she was aware. You knew what the cause of action was. You knew that if you had an issue, it was time to bring it, and she chose not to. The fact that she says that my clients never gave her notice of meetings, that's completely understandable because you were no longer a shareholder. At least that's what my client said. What would you say would be the cause of action when the rejection of that $500 above investment? I think it would have either been a breach of contract action, Judge, or possibly something with declaratory relief. This would be a valuation? It possibly could have been a 12.56 action at that point, Your Honor. But the fact of the matter is it would have had to be determined as a condition preceded to the 12.56 action that she was in fact a shareholder. 12.56 is a shareholder oppression. But the fact is, and my client is not trying to make light of this, Your Honor. My client is simply saying, we told you back in 2004. We didn't expect that you were going to file a lawsuit, and then you did file the lawsuit many, many years later. Weren't they a little curious as to why she didn't cash the check? I think so at some point, Your Honor. But at that point my client continued to take a consistent position. They tried to, and I know that we're looking at these letters, but those letters, quite frankly, are attempts to maybe resolve the situation short of litigation, but I don't think that's inconsistent with the position they originally took, Judge. What authority does someone have to unilaterally say you're no longer a shareholder to take the action? Was there a shareholder meeting that everyone had noticed of, including the plaintiff? In the record, Your Honor, in the poorly drafted documents, again, they didn't have lawyers. My client pointed to a shareholder meeting note that said that if my clients weren't happy with you, they could give you back the money. Now, I know that Mr. Scarr is going to disagree with that, but there was a note in the corporate records, and that's within the record itself. And that's why my client took that position. So you're saying that's a mandatory buyout clause or something? I'd love to give the person who drafted that that much credit, Your Honor, but it wasn't necessarily as a claim. It was essentially a note from my client pursuant to a meeting that they had saying that Ms. Vizcarra, if my client wasn't happy with what she was doing, then she could essentially give her her money back. That's essentially what the reference was, and I'd be happy to give that reference to the court if it shouldn't be there. So with respect to counsel's argument of the continuing violation exception, it is not a continuing violation. It stems from one sole act, and I think that's why the Ravens case is very important. Counsel also talks about Section 12.56 not having a statute of limitations period, but 12.56 really doesn't talk to a statute of limitations provision, so ultimately my argument to the court would be that it would be the default provision under Section 13.205 of the Code of Civil Procedure, which imposes a five-year statute of limitations. But again, the main point we're trying to make, Your Honors, is that the original action occurred in 2004, so when we look at 12.56, before the plaintiffs can even bring their 12.56 action, they must meet the condition preceded that they were a shareholder at that point. They also speak to the discovery rule, Your Honors, and the discovery rule really doesn't work here because the fact of the matter is that they didn't get notice of shareholders' meetings, that they didn't get notice of board meetings, that they didn't get dividends. That all makes sense because my clients essentially disclaimed the fact that there were shareholders at that point, and my clients had no reason to go ahead and show them any different other treatment. And there's no evidence in the record to show that my client was inconsistent in that regard whatsoever. With respect to the second issue, really we're describing an alternative theory that we raised on a counterclaim. And the counterclaim is that if Ms. Vizcarra was saying that she is entitled to money from my clients for the hard work that they did, in equity we are also saying that Ms. Vizcarra, because of her obligations as a fiduciary member of this organization, and not providing any of those, would also in turn have to pay my clients for her failures. And what we had asked for at that point is the sum of $1,442,773, which is what my client as an equal shareholder would have made in that exact period of time. And that's an alternative argument. Thank you very much. Mr. Wilson. Good afternoon, Your Honors. And may it please the Court, Brian Wilson on behalf of the appellee Maria Vizcarra. Your Honors, defendants continue to dramatically mischaracterize this October 2004 letter on this appeal, just as they did repeatedly in the trial court below. They make repeated claims, and I'm quoting directly from page three of the appellate brief, that defendants were unapolitical, that they were no longer going to treat plaintiff as a shareholder of LMR after providing a check on October 7, 2004. That is flatly in every way wrong. This is why this argument failed four times below at the motion to the Smith stage, at the summary judgment stage, at trial, and at post-trial, and it failed with two separate circuit court judges. There was a different judge that denied this at the motion to the Smith stage than Judge Rickman who denied it later. And it's because they keep tying this argument, and it's entirely founded on their characterization of the letter, which is not only inaccurate but flatly contradicted by the letter. The easiest way to determine that, Your Honors, is to do what I can see you have already done, and that's look at the language of the letter itself. You don't need to rely on the appellant's characterization of the letter, and I'm not going to provide a contrary characterization. The letter is very short and clear, and it says, although the exhibits were not included in the record, the text can be found elsewhere, and it says, Mr. and Mrs. Ranchero desire to purchase your share of the LMR Home Health Care Inc. Upon receipt of this letter, please contact me so I can forward you additional documents for your execution. There is only one way to read that letter, exactly what it says. It is a desire to purchase. In denying this argument on summary judgment, Judge Rickman even italicized and bolded that to emphasize the point, this letter is not as defendants claimed it was below. It is not as they claim it is now. During our argument, Mr. Rays continued to characterize the letter as essentially a way of saying, you're not doing your part. Here's your money back. You're no longer going to be a shareholder. There is just something, nothing in the four corners of this letter that can in any way support that, and it never did. Okay, so what you have put to the chase is an offer to purchase shares. Which was rejected. Closely held corporation. Correct. Organized in the state of Illinois. Correct.  Yes, absolutely an offer to purchase. When does your client become an oppressed minority shareholder in your view? Well, it's difficult to answer one particular. Does it have to have that status, or do you? You do have to be an oppressed shareholder, correct. And I suppose the best answer is, well, oppression is not necessarily limited to one point in time. It depends what the oppressive acts are. You can be oppressed once. You can be oppressed continuously if the other shareholders are continuously rejecting your rights, which is what happened here. So it really depends on the facts as they were developed and the context of what happened to Mrs. Carr. It's the only case before this. Correct. So I'll turn to the facts here. And the reason this case is a very simple one, Your Honors, is because the statute of limitations, we can accept for the sake of argument that a five-year limitations period applies in this case. That is what the accounts are. Can you be oppressed if someone makes you an offer for your interests, your shares, and you decline it? In no way, shape, or form. Ironically. So when do you become an oppressed minority? We know that she's a minority shareholder. Correct. Now the question is, when is the oppression? Well, the oppressions have many forms over many years and at many different points. And the reason I want to conceive for the sake of argument, for the sake of simplicity, that a five-year limitations period applies is because the complaint was filed on July 8, 2011. Five years prior to that would be July 6, 2006. So any oppressive conduct that took place in that window would undeniably be timely and support plaintiff's complaint. Because that is in the window that even the defendants would have to conceive were working with on adopting their five-year limitations period. The record undeniably shows, and these acts really weren't contested below, virtually all of the oppressive conduct that the defendants engaged in against Ms. Vizcarra happened in that five-year window. It happened in the limitations period that would exist even if the defendants are correct that a five-year limitations applies. You're not conceding that you're doing this for argument. For the sake of argument. Because it doesn't make one difference whether it's five years or not. We'll accept it because it makes no difference. Now, just because oppressive conduct may have occurred even before the five years, even outside of it, that does not mean that Ms. Vizcarra cannot prosecute a shareholder's action based on oppressive conduct in the window of five years. And the Supreme Court's case of Belville, which we cite, is instructive on this point. In that case, the plaintiff argued, among other things, that the defendant was violating the Automobile Franchise Act by unfairly allocating them automobiles. This happened about two to four times a month.  The plaintiff sued for wrongful acts, violations of the statute, within those four years and without. And the defendant successfully argued up to the Supreme Court that the plaintiff could not proceed with its cause of action based on statutory violations outside of the four-year window. But the Supreme Court rejected the defendant's argument that the entire action was untimely and said, as long as violations occurred in the four years, the cause of action could proceed on that and it was timely. Here, again, the vast majority of oppression that was proven at trial below happened within, between July 2006 and the filing of the complaint, within the five-year window that we would be working with, even if the appellants are correct. There were three records requests, 2006, 2007, and 2011. They were all denied. All of the self-dealing, the over $1.5 million of loans that were made to the individual defendants from the company and to their related entities, that all took place between 2007 and 2011. There were annual meetings of directors and shareholders in 2006, 7, 8, 9, 10, and 11 that Ms. Vizcarra was never notified of, had no opportunity to participate in, never got minutes of afterwards. In 2011, the bylaws were amended without any notice to her or any chance to participate. And in 2012, the defendants effectively reallocated the shares so that they gave her shares in the company, which she never agreed to sell to them, to their son, Kevin Ranchero, without any notice, for no consideration. Everything I just said, no one contested at trial that those acts occurred or when they occurred. They all, all fall within the statute of limitations period that even the defendants would have us working with. So there is simply no way that this claim can be untimely when the oppressive conduct proven at trial that justifies Judge Rickman's award all happened within five years prior to the complaint being filed. I want to step back on this point and highlight how dangerous it would be to accept the defendant's argument on the statute of limitations point. They are saying that this letter triggered Ms. Vizcarra's cause of action for shareholder oppression, which I have to point out is very ironic because this is actually one of the few inactionable things they did. There is no cause of action when someone tries to buy your shares. You can always say no, that's not an act of oppression, that's not fraud or illegal, that's nothing. It happens all the time. So not only is October 2004 not when her cause of action occurred, absolutely no cause of action came into being that day at all because they hadn't done anything wrong yet. But their argument is that's the day that the shareholder oppression action occurred. So five years out from that, the limitations period expired in October 2009. They continued to oppress her after that. There was a record request denied. They gave her shares to their son. They continued making loans. Under their theory, as of October 2009, they could oppress Ms. Vizcarra indefinitely, forever, in any way they wanted because she would no longer have any right to redress even future oppression. It is very dangerous to accept any theory or rule where the statute of limitations for wrongful conduct not only begins to run but can actually expire before the wrongful act even happens or is finished happening. And on this point, the Supreme Court made a very apt statement in its case of FETMAR versus FETMAR, which is 207 Illinois 2nd, 263. It said, the purpose behind the statute of limitations is to prevent stale claims, not to preclude claims before they are rightful adjudication, and certainly not to shield the wrongdoer. Because she was actively being oppressed when she filed suit, because the oppression had existed throughout the five years prior to filing suit, this claim was timely, it had to be timely, or else she would basically be relegated to nothing but a victim. They would have an open-ended license under their theory as of October 2009 to oppress her without legal recourse. She would have no more rights. That obviously cannot be the rule, that is not what Judge Rickman accepted, and there is no basis in the record to reverse his ruling on that point. I will briefly – oh, before moving on to the counterclaiming honors, we've raised a few theories. While I mentioned that Ms. Vizcarra's claim is timely, even just looking at the five years prior to filing the complaint, we have raised a few theories that would allow her to pull oppressive acts even outside those five years into her lawsuit, like the continuing violation rule and the discovery rule. Totally unnecessary to get there. There's no reason that your Honor needs to go that far. But I do want to mention, regarding the continuing violation rule, the opponents did argue in their reply brief that we have waived that argument by not raising it below. We didn't get a chance to respond, so I just want to point your Honors to where in the record we actually did raise this argument below, and we have preserved it. It's at the common law record at page 1241. So I'll briefly turn to the counterclaim. The counterclaim – every element of the counterclaim failed. Essentially, what they are arguing is that Ms. Vizcarra, by virtue of being a shareholder, had a fiduciary duty to work for the company and breached it by not working for the company. Mr. Rabe made a few comments earlier on about what the expectation of the parties were and that she was supposed to participate and did not, and all of that was litigated before Judge Rickman, and that is not before you on appeal. None of those findings or even those issues are what is within the defendant's appeal. But the reason I say every element failed is starting right from the duty. Defendants have cited no case below and no case here where someone owns a duty to work for a company just because they own shares in it, and that makes sense. Everyone owns shares in companies they don't work for. Some of the cases we cited to you regarding shareholder oppression, when they give the factual recitations of the case, they mention in passing some of the owners just don't do work for the company. That is commonplace. Judge Holdred, as you mentioned, sometimes people just want capital, and while the accountants try to minimize the amount of capital my client put in, it's actually the exact same amount that they put in. It was all that was needed. No one paid any more money into the company after the original contribution, so she matched them dollar for dollar. So there is no duty in the law for good reason that you have to work for a company just because you own shares. Because there is no duty, there cannot be any breach. And before I move on to their problem with damages, I want to mention as we cite in our brief that they knew my client, Ms. Vizcarra, owned a separate health care company when they allowed her to purchase shares in LMR Health Care. So there can be no kind of, if there's an element of disloyalty that they're trying to press in their counterclaim, we've said it in the record where they knew that she was working for another company, and that's not the basis of a counterclaim. But that's not really the theory they were working on. It was really that she had to work for the company. Even if a duty did exist and even if it was breached, the defendants put in no cogent evidence or theory of damages whatsoever. And this is not hyperbole. No evidence whatsoever of damages. The argument below as it is here is that essentially if Ms. Vizcarra was supposed to work for LMR, LMR would have made from her efforts the same amount of money it paid one of the defendants, Lolita Ranchero, as a salary. And there is simply no logical connection between what a company would make from working for it versus what it pays someone else as a salary. They also failed to account for, in this damages number, that if she in fact was working for the company, she would be entitled to a salary. She's not an indentured servant. So whatever money they say they would have gotten from her, they would have had it in some decrease in what it would have paid her. Ms. Ranchero, the Rancheros, was made over a million dollars each for working for the company. But there's no credit, not even for a dollar, if Ms. Vizcarra was supposed to work for the company. So for all these reasons, Your Honor, the judge would have made, he got it right. This was really the only ruling justified by the record. There is no basis to reverse him on appeal. So we ask that the decision be affirmed. Thank you. Thank you. Mr. Ray's rebuttal. Good afternoon again, Your Honors. And a very, very brief rebuttal. Counsel has raised a couple of things, and I'd like to start off by talking about the comment that he made with respect to a dangerous. I think what's really dangerous here is that we're really not dealing with a shareholder oppression case. If we're dealing with a shareholder oppression case, I didn't get notice of a meeting, I didn't get my dividend, I didn't get anything of that. I understand that. And we litigate those cases every single day, but that's not the slippery slope here. The slippery slope here is that, you know, we're not a shareholder. They told her she was not a shareholder. They went to her office, they gave her a check, they did that. I understand there's a letter out there. But the record is clear, and I think Judge Rickman also said this. They didn't do anything after that. They did absolutely nothing. And now they come to the court saying it's absolutely fair, and I absolutely don't think that's the case that we have here. If we were simply dealing with a case that they didn't give notice of the shareholder's meeting or they didn't pay a dividend, I can understand that. But that's not what 12.56 says. It says that you're oppressing a minority shareholder, but that's not what we have here. They said in 2004, we're not a shareholder. It should have been filed at that point. They should have done something at that point. And now they come back and say, even if you disregard the five-year statute of limitations, give us the shareholder oppression that occurred many, many years later. And the slippery slope is, when does it stop? That's really the issue. With respect to the amount of money that was paid into the case, that's not, in fact, true. The part, Mrs. Renshaw testified she paid over $100,000 more into the company for the show money, paid out of her pocket for the nurses and the physical therapists. There's a huge discrepancy in here. So when they come back and say that she was just entitled to give $11,500, that's not a home health care agency. We're dealing with some of the most fragile people in our society, the seniors. And what they do is very, very difficult. So for them to come and say we're just putting money into Apple, that's absolutely not this case. This case started in 2004. My clients did everything. They even gave the money back. They went to her. And I understand that the record, because attorneys weren't involved, is somewhat sloppy, if you will, but the gist of it was they knew what they were supposed to do in 2004. They got their money, and at that point they were made whole. And even if we go back to the 12.56, they're confusing all the issues because that's when it started. With respect to the last position, my client says that she's a shareholder, they're a shareholder, and if they should have done something, should be compensated by Mrs. Vizcarra because she should have participated. The testimony in the record was that Mrs. Ranchero and Mrs. Vizcarra discussed what was supposed to happen, and Mrs. Ranchero told her we need your help in developing the company. No one creates a home health care agency where you have to go see patients, you're responsible for them 24-7, and say I'm willing to give you 33% of a company for $11,500. You're on the hook 24-7. That's just simply not reality. I thank you very much again for your time today. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. With that, we will take a brief recess for our panel.